Winfried **HEIRINGHOFF**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 08–02–00228–CR.

Court of Appeals of Texas, El Paso.

Aug. 22, 2003.

Rehearing Overruled Sept. 17, 2003.

Discretionary Review Refused April 28, 2004.

---

Gregory C. Anderson, Anderson, Anderson, Bright & Crout, El Paso, for Appellant.

Jose R. Rodriguez, County Attorney, El Paso, for State.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

Winfried Heiringhoff appeals his convictions for three misdemeanor offenses of

intentional or knowing unauthorized discharge under Section 7.145 of the Texas Water Code.[1] After the jury found Appellant guilty of each charge, the trial court assessed punishment at one year jail time, probated two years, and imposed a fine of $20,000, $18,500 probated with sentences to run concurrently. On appeal, Appellant raises eight issues in which he argues the trial court erred in failing to instruct the jury on lesser-included offenses, challenges the factual sufficiency of the evidence to support the convictions, and complains that the trial court's sentence was illegal, vague and/or unreasonable and alternatively, one of the probation conditions was a delegation of the court's responsibility. We affirm.

## SUMMARY OF THE EVIDENCE

Appellant is the owner of 215–217 McArthur, a trailer park, in Canutillo, El Paso County. Mobile home residents rent space on the property. There are ten to twelve mobile homes on the property and a house which is also rented. During the summer of 2001, Celso Rangel, a resident at the trailer park for over three years, on three different occasions observed and videotaped Appellant pumping sewage out of one of the park's cesspools. In the first two incidents on July 28, 2001 and August 5, 2001, Appellant pumped the sewage onto the ground of an adjacent property. In the third incident on August 11, 2001, Appellant pumped the sewage from the cesspool into another causing the second to

overflow, spilling sewage onto the ground. The pipe from which Appellant pumped the sewage is about eight to ten feet from Mr. Rangel's trailer. Mr. Rangel recalled that in the first incident, the pumped sewage and waste water ran back underneath his trailer home and stunk strongly of human waste. This smell lasted three to four days. In the August 5 incident, Mr. Rangel videotaped Appellant pumping out sewage at 9 a.m. in the morning for over twenty-five minutes. The sewage ran back underneath Mr. Rangel's trailer, forming a pool of sewage for the following three days. The liquid contained particles of human waste, was black in color, and smelled for three to four days. Mr. Rangel also observed Appellant cleaning his pumping equipment by hosing it with water, which also ran underneath the trailer. Mr. Rangel stated that the sewage dumped on the adjacent land on the other side of the property fence remained there for about a day and a half. According to Mr. Rangel, this was because the land was all sand and filtered the sewage faster. In the third incident on August 11, 2001, at 7:28 p.m. in the evening, the sewage overflow went underneath Mr. Rangel's trailer and next to another trailer on Appellant's property.

On November 1, 2000, Appellant had hired Ruben Gallegos of Henry's Cesspool Service and Construction, Inc. to pump and properly dispose of material from the cesspool at issue.[2] Mr. Gallegos charged

---

1. Appellant was charged by information with three separate offenses. The independent causes of action were tried together, but remained separate cases. On appeal, Appellant challenges the trial court's judgment in each case and raises the same issues for our review, but each case has a separate appellate opinion. The companion cases for this opinion are Nos. 08–02–00229–CR, 2003 WL 21995475 and 08–02–00230–CR, 2003 WL 21995474.

2. At trial, Mr. Gallegos explained to the jury that a cesspool is an open pit in the ground that is usually lined with cinder blocks with a cement top. Liquid seeps from the bottom and all around the sides until it fills up or becomes oversaturated. A septic tank differs in that it is a sealed concrete or metal tank which does not permit seepage. Rather, it holds entering fecal matter and solids, which form a sludge as a result of bacteria action breaking down the matter and ultimately

Appellant at a rate of eight cents per gallon plus a 6.75 percent service tax to pump the 6,000 gallon cesspool. Mr. Gallegos serviced the cesspool by using a three-inch vacuum pump attached to his truck container and sucking out everything, including as much sludge on the bottom as possible. Appellant's cesspool is approximately ten feet deep. There were three trailers hooked up to the cesspool and it was receiving perhaps 4,500 gallons per day. Mr. Gallegos recalled that at the time of service, the cesspool was in pretty bad shape and running over. Mr. Gallegos observed fecal matter flowing out of the tank and believed the cesspool was extremely saturated. In his opinion, the cesspool was oversaturated and no longer leaching out because the bottom ground was already sealed by carbon. By the time he serviced the cesspool, it was just an open bucket. After servicing the cesspool for a second time a couple of weeks later, Mr. Gallegos was not called to service it again.

Mr. Gallegos also testified that if one were to pump a cesspool once a week, the suspended solids floating at the top, such as fecal matter, toilet paper, and sanitary napkins, would not have had time to coagulate and break down into sediment on the bottom. From the videotape, Mr. Gallegos observed that Appellant used a two-inch centrifugal pump in pumping out the 6,000 gallon cesspool. He observed that the water being pumped out onto the ground was murky and sudsy. Based on his training and experience, Mr. Gallegos defined sewage as a combination of water, fecal matter, toilet paper, sanitary napkins, greases, and food particles. Mr. Gallegos explained that construction of new cesspools is illegal, but pre-existing cesspools have been

grandfathered in and depending on maintenance and the amount of entering water, a cesspool could last anywhere from two to ten years.

Deputy Rodolfo Payan of the El Paso County Sheriff's Department Environmental Crimes Unit testified that he was familiar with Appellant's property at 215–217 McArthur in Canutillo. In August 2001, he was contacted by Ms. Dominguez of the El Paso City County Health Department and given the videotape taken by a resident of the trailer park which showed a discharge from a ground cesspool. After watching the videotape, Deputy Payan started an investigation and went out to the location several times during August 2001. On those trips, Deputy Payan observed swampy water underneath a trailer and noticed very green grass in certain areas around the trailer park while further out the land was all dry. Deputy Payan also detected a strong ugly smell of feces around the trailer park.

Rose Marie Dominguez, an environmental inspector with the El Paso City County Health Department, testified that her department is in charge of inspecting on-site sewage facilities and making sure septic systems meet the regulations set by the Texas Natural Resource Conservation Commission ("TNRCC"). In August 2001, Ms. Dominguez responded to a complaint in reference to Appellant's property. On August 6, 2001, Ms. Dominguez went out to the property to conduct an investigation. She walked around the property and did not note any violation with respect to septic waste. Ms. Dominguez did not specifically look underneath the trailers and did not detect any odor. She did notice green

turns into carbon. Outgoing water or effluent is directed to and percolates in a leaching area. The County Health Department provides the specifications for a leaching field and requires they be at least four to six feet above the water table based on the theory that the water emitted will be cleaned by the soil before reaching the ground water.

vegetation in the area, which is an indication that a septic system has too much liquid in it causing the ground to be over-saturated. Ms. Dominguez recalled that the weather on August 6 was very hot and if anything had been pumped out in the area, it would have evaporated because of the heat or gone down to the ground. Later in the month, Ms. Dominguez returned to the site and gathered a water sample from a well near the house and later a water sample from the cesspool. The water samples were delivered to the Health Department lab for analysis.

Teresa Owens, a microbiologist with the El Paso City County Health Environmental District, was the lab technician who tested one of the collected water samples. Lab results of the cesspool sample tested positive for e. coli or fecal contamination and coliform bacteria. Ms. Owens testified that the well water sample tested negative for coliforms, that is, the water was clean.

Dr. Jorge Magana, the director of the District, testified that the cesspool water sample lab results were consistent with testing of water from a cesspool or septic tank. Dr. Magana stated that the health effect on individuals who ingest water contaminated with e. coli or coliform groups depends upon the age of the individual. Young children and the elderly are at greater risk for gastrointestinal infections. Symptoms may include upset stomach, nausea, vomiting, diarrhea, cramps, fever, or other serious illness, depending on the toxicity of the germ. In his opinion, water containing e. coli or coliform groups would be considered contaminated and would be classified as a pollutant.

Rick Talamantes, a criminal investigator for TNRCC testified that he was informed that there was some type of a discharge at 215–217 McArthur in Canutillo and he went out to the location to investigate. Using a handheld GPS, a global position-ing device, Mr. Talamantes walked the perimeter of the property, marking the four corners of the property and a pipe on the other side of the property fence as weigh points. Mr. Talamantes then walked a straight line to the Rio Grande River and marked that position as a weigh point. Through Terrain Navigator computer software, Mr. Talamantes created a topographical map of the area. The computer estimate of the straight line distance, or track length, from Appellant's property to the eastern bank of the Rio Grande River was 1,428 feet.

Terry McMillan is a manager for the Waste and Waters Sections of the TNRCC in the El Paso region. Mr. McMillan oversees TNRCC investigatory activities in this region. Part of this work involves studying the groundwater in El Paso County on a regular basis and knowing the water table, the depth of groundwater in the county. If someone had a permit to discharge sewage, Mr. McMillan as section manager would have knowledge of this information. To his knowledge, Appellant did not have a permit to discharge and in Mr. McMillan's past nine years as section manager, Appellant has not had a permit to discharge sewage.

Mr. McMillan testified that he had been out to 215–217 McArthur in Canutillo and was familiar with investigatory reports concerning underground water in the proximate area of that location. On average, the agency measures the depth of groundwater in that area about five times a year. Based on this knowledge and the agency's research, it was Mr. McMillan's opinion that the depth of groundwater near 215–217 McArthur ranged from eight to twenty feet, depending on the amount of water in the Rio Grande River, the season, irrigation activity, and rainfall. According to Mr. McMillan, the depth of underground water would be at its highest in July and

August and the agency normally observes an eight to ten foot water table at that time of year. Their most recent measurement near Appellant's property was in January 2002, at which time the water table was at eighteen feet at a location about two-tenths of a mile south of the property address.

Mr. McMillan was also familiar with the permeability of the soil in that area. Mr. McMillan explained to the jury that permeability is the rate of flow through soil or surface rock. Mr. McMillan's knowledge on this matter was formed by his observations of well driving and installation, his investigators work in observing wells, published data, and permeability studies of the area. According to Mr. McMillan, the soil at 215–217 McArthur is sandy loam, a mixture of sand, clay, gravel, and silt, which is fine grain sand stone. Depending on the amount of gravel, the soil's permeability is between one to twenty inches an hour. On average, its permeability is ten to twelve inches an hour, that is, if someone poured fluid on the ground surface on Appellant's property, it would travel through the soil at a rate of approximately a foot an hour. A soil study of the entire region showed the soil type around 215–217 McArthur to be AU1 sandy loam. With respect to the land between 215–217 McArthur and the Rio Grande River, Mr. McMillan stated that there is a two foot drop in elevation between Appellant's property and the river bank. The underground water in that area runs downhill, approximately due west toward the Rio Grande River. Appellant's property is on the east side of the Rio Grande River. According to Mr. McMillan, the rate of permeability is affected where ground has been previously saturated. If the soil is wet, new fluids that are introduced into it will move faster than if the soil was dry. If the soil is dry, it will take a while for the liquid to saturate the soil, but if it is already wet, the liquid moves right through the soil like a pipeline.

As section manager, Mr. McMillan was also familiar with groundwater contaminants and the relationship between groundwater in that area and the Rio Grande River. The ground between the surface and groundwater will filter out contaminants like fecal coliform and e. coli to some extent, but in order to do so efficiently there needs to be several hundred feet of ground between the surface and the groundwater. Eight to twenty feet would be minimal filtering and he would expect the contaminants to make it to the groundwater at that depth. Mr. McMillan also stated that the groundwater in the area is in direct contact with the Rio Grande River surface water and the irrigation ditch that runs between the Rio Grande and the railroad tracks.

On cross-examination, Mr. McMillan conceded that he had not gone onto Appellant's property nor had he examined the sand on that land. However, he did visually observe the soil in the area and noted it was sandy loam at the surface. Mr. McMillan made this observation along the right-of-way on McArthur Street about twenty feet from the trailer park. Mr. McMillan admitted that TNRCC did not go to the discharge location and take a sample to see what pollutant, if any, was in the soil. No one from his office went to the discharge spot and drilled to determine the actual water table. Further, Mr. McMillan did not gather sand and run a fluid through it to test its permeability. Rather, Mr. McMillan's testimony was based on information and factual sampling data gathered throughout that area.

Defense counsel questioned Mr. McMillan about his recent examination of the water table in January 2002. Mr. McMillan agreed that Appellant's property is

uphill from the location on Doniphan where the agency observed a monitoring well. Appellant's property is most likely a foot higher, which would mean the water table in comparison would measure nineteen or twenty feet. Mr. McMillan conceded that the water table could be as low as twenty to twenty-five feet, but historically it ranges from eight to twenty feet. If it had not rained in a long time, the water level could be lower than normal as various factors can cause fluctuations in the water level.

Defense counsel also questioned Mr. McMillan about the leaching system in septic tank designs. Mr. McMillan agreed that leaching effluent in septic tanks includes e. coli if it is present in the fluid and that TNRCC authorizes installation of septic tanks with leach fields that are only two feet above the groundwater. Mr. McMillan stated this is a sufficient barrier for soil absorption of the e. coli-containing fluid prior to reaching the groundwater. Leach lines, however, are designed to emit very small amounts on the side and top of the line, so that the emission can be absorbed and digested in the top few inches of the soil. The system is designed to minimize downward migration. Natural bacteria in the soil will digest the emission in small amounts. Leach lines are designed for very small leaching amounts and cannot handle large amounts of effluent. If the soil is too permeable, liners are required. Leach lines are installed in shallow soil because exposure to sun aids in the digestion by natural bacteria in the soil. Mr. McMillan conceded that he could not testify as to how far the e. coli in the alleged discharges traveled through the sand nor whether the e. coli was in some fashion removed from the soil before reaching the groundwater. However, he maintained his opinion that it would take several hundred feet to completely clean out a contaminant before reaching the groundwater.

The State called Roberto Gonzalez, a program manager for the on-site sewage facility program of the El Paso City County Health Department, to testify about the program enforcement and its policies and procedures on septic systems. Mr. Gonzalez stated that his department issues permits only for septic tanks, not cesspools, but cesspools existing prior to August 24, 1988 are grandfathered from the new standards. His department deals with cesspools if they are creating a nuisance, backing up, or overflowing. They do not require pumping unless the cesspool is backing up. If problems persist, the cesspool will no longer be grandfathered and the department will require construction of a system that meets current standards.

Mr. Gonzalez also described the common two-compartment septic tank system to the jury. In this system, heavier solids sink to the bottom to form sludge, while the remaining liquid, effluent, goes to the second compartment, which is connected to the leach field lines of perforated pipe. From the leach lines, the effluent filters into the ground. His department requires at least six inches of gravel or other approved media on the bottom of the leach field to act as a chamber. Mr. Gonzalez stated that his department does not approve a septic system that uses more than 5,000 gallons of domestic waste per day. Tank size and leach lines are determined by the anticipated water flow per day.

After the State rested, the defense called two witnesses to testify on Appellant's behalf. Jerry Estep, a real estate broker and longtime friend of Appellant, testified that on February 19, 2002, he videotaped the drilling of a hole in the ground at 215–217 McArthur for the purposes of locating the water table on Appellant's property. Mr. Estep observed

workers drilling a large hole near the back of the property. Using a tape measure attached to a rock, they measured the hole depth at approximately twenty-two feet. Mr. Estep did not see dripping water, but rather the sand was dry. They could not drill any deeper because of equipment limitations.

Frank Gadet, a self-employed environmental engineer, testified about the soil permeability conditions on Appellant's property. Mr. Gadet has a background in water resources planning and worked for the city of Fort Worth in its waste water division as a manager for its industrial waste division. Mr. Gadet is now in private practice and works with industrial clients in waste water treatment and remediation of contaminated soils. At Appellant's request, Mr. Gadet went to 215–217 McArthur that morning before trial to test the permeability of the soil. Mr. Gadet collected some of the soil in a bucket and placed a six-inch sample into a plastic cylinder. He then poured two inches of water onto the soil and observed the sample for the next half hour. The soil was sandy, but it did absorb the water. The water did not extend more than five to six inches down and the remaining tube was dry. Mr. Gadet described the soil type as sandy loamy, but noted that it was very dry. According to Mr. Gadet, there are several mechanisms by which soil interacting with a pollutant will act like a filter to absorb and clean waste water. Mr. Gadet was familiar with studies which suggest how far it takes water percolating through soil to travel before coliforms in the water are almost completely treated. A study found that coliforms and viruses can be completely removed after passing through just a few feet of soil. Mr. Gadet was also familiar with the TNRCC regulation that requires a leach field to be only two feet above groundwater. In Mr. Gadet's opinion, the waste water placed on the ground in Appellant's case dried out and started to percolate and be absorbed. His experiment showed that two inches of water would be percolated in six inches of ground. The waste water did not come anywhere near the ground water, which was deeper than twenty-two feet. In his opinion, the fluid was absorbed by the soil and did not go more than three feet in the ground, therefore any coliform or other pollutant from the discharge remained in the soil and did not reach the groundwater.

## DISCUSSION

### Lesser–Included Offenses

In Issues One through Five, Appellant contends the trial court erred in failing to instruct the jury on alleged lesser-included offenses contained in Section 341 of the Texas Health and Safety Code, namely Sections 341.013(b), 341.013(c), 341.014(a), 341.014(b)(2), and 341.014(e). In his brief, Appellant argues that the lesser-included offenses for "improper disposal of waste or human excreta" were requested based on the premise that evidence showed Appellant had committed health and nuisance violations, rather than water pollution violations.

We apply a traditional two-prong test to determine whether Appellant was entitled to a charge on a lesser-included offense. *See Moore v. State*, 969 S.W.2d 4, 8 (Tex.Crim.App.1998); *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex.Crim.App. 1993)(en banc), *cert. denied*, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim.App.1985); *Royster v. State*, 622 S.W.2d 442, 446 (Tex.Crim.App.1981)(plurality opinion). First, we determine whether the offense is a "lesser included offense" as defined in Article 37.09 of the Code of Criminal Procedure, which in most

cases requires deciding whether the "lesser included offense must be included within the proof necessary to establish the offense charged...." *Bignall v. State*, 887 S.W.2d 21, 23 (Tex.Crim.App.1994); *see* TEX.CODE CRIM.PROC.ANN. art. 37.09 (Vernon 1981); *Moore*, 969 S.W.2d at 8; *Ramirez v. State*, 976 S.W.2d 219, 226–27 (Tex.App.-El Paso 1998, pet. ref'd). Second, the record must show some evidence that would permit a rational jury to find that if the defendant is guilty of an offense, he was guilty only of the lesser offense. *Feldman v. State*, 71 S.W.3d 738, 750–51 (Tex.Crim.App.2002); *Moore*, 969 S.W.2d at 8; *Rousseau*, 855 S.W.2d at 672.

In this case, Appellant was charged by information with three separate offenses of intentional or knowing unauthorized discharge under Section 7.145 of the Texas Water Code[3], each charge differing only in the date the charged offense was alleged to have been committed. In each amended information it alleged Appellant:

> [D]id then and there unlawfully, intentionally, and knowingly discharge, deposit, emit, drain, allow to seep, releases or dispose of and permit the discharge, deposit, emission, drainage, seepage, release and disposal of a waste or pollutant, namely SEWAGE into and adjacent to water in the State, namely, underground water located near 215 McArthur, Canutillo, El Paso County, State of Texas, which caused and threatened to cause water pollution, and said discharge was not discharged in strict compliance with all

required permits or with an order issued or a rule adopted by the appropriate regulatory agency in violation of Texas state law section 7.145 V.T.C.A. Water Code.

At trial, Appellant's counsel requested the following as lesser-included offenses for "improper disposal of waste or human excreta": (1) a person commits an offense if he allows sewage to accumulate in a public place or discharges sewage into a public place; (2) a person commits an offense if he deposits or disposes of polluting material or waste in a manner that may cause pollution of surrounding land or may cause the contamination of groundwater; (3) a person commits an offense if he disposes of human excreta in a method not approved by the health department; (4) a person commits an offense if he disposes of effluent from a septic tank in a method that creates a public health nuisance; and (5) a person commits an offense if he removes human excreta from any place and handle[s] it in a manner that creates a public nuisance. The trial court refused to instruct the jury on the asserted lesser-included offenses.

Under Article 37.09 of the Code of Criminal Procedure, an offense is a lesser-included offense if::

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the

---

**3.** Section 7.145 of the Water Code provides: "A person commits an offense if the person, acting intentionally or knowingly with respect to the person's conduct, discharges or allows the discharge of a waste or pollutant: (1) into or adjacent to water in the state that causes or threatens to cause water pollution unless the waste or pollutant is discharged in strict compliance with all required permits or with

an order issued or a rule adopted by the appropriate regulatory agency." TEX.WATER CODE ANN. § 7.145(a)(1)(Vernon Supp.2003). An offense under this section is punishable by confinement for a period not to exceed five years and/or fine not less than $1,000 or more than $100,000. *See* TEX.WATER CODE ANN §§ 7.145(b), 7.187(1)(C), (2)(F) (Vernon 2000 & Supp.2003).

same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX.CODE CRIM.PROC.ANN. art. 37.09 (Vernon 1981).

▬▬▬ As set forth in *Jacob v. State*, 892 S.W.2d 905 (Tex.Crim.App.1995), we employ a three-step analysis in examining whether the asserted lesser-included offense is established by the same or less proof than the facts required to establish the commission of the offense charged. *Id.* at 907–08; *Rodriguez v. State*, 90 S.W.3d 340, 369 (Tex.App.-El Paso 2001, pet. ref'd). First, we examine the elements of the charged offense as they appear in the indictment, with special attention to the facts required to prove the charged offense. *Jacob*, 892 S.W.2d at 907. "Facts required" means the evidence legally required to prove the elements of the charged offense. *Jacob*, 892 S.W.2d at 908. Second, we examine the statutory elements of the offense sought as a lesser-included offense. *Id.* at 907. Lastly, we must examine the proof presented at trial to show the elements of the charged offense. *Id.* at 907–08. "If the facts required to prove the elements of the lesser-included offense are not functionally the same or less than the charged offense, it is not a lesser-included offense even if the facts presented at trial could prove the lesser-included offense." *Noyola v. State*, 25 S.W.3d 18, 21 (Tex.App.-El Paso 1999, no pet.)(analyzing the Court's interpretation of Article 37.09(1) in *Jacob v. State*).

*Section 341.014: Disposal of Human Excreta*

In Issues Two, Three, and Four, Appellant argues that paragraphs (a), (b)(2), and (e) of Section 341.014 of the Texas Health and Safety Code are lesser-included offenses of unlawful discharge under Section 7.145 of the Texas Water Code. In pertinent part, Section 341.014 provides:

(a) Human excreta in a populous area shall be disposed of through properly managed sewers, treatment tanks, chemical toilets, or privies constructed and maintained in conformity with the department's specifications, or by other methods approved by the department. The disposal system shall be sufficient to prevent the pollution of surface soil, the contamination of a drinking water supply, the infection of flies or cockroaches, or the creation of any other public health nuisance.

(b) Effluent from septic tanks constructed after September 4, 1945, shall be disposed of through:

(1) a subsurface drainage field designed in accordance with good public health engineering practices; or

(2) any other method that does not create a public health nuisance.

. . .

(e) Material and human excreta removed from a privy vault or from any other place shall be handled in a manner that does not create a public health nuisance. The material and human excreta may not be deposited within 300 feet of a highway unless buried or treated in accordance with the instructions of the local health authority or the board.[4]

**4.** Apparently, in Appellant's proposed jury charge, numbers three through five were in

TEX.HEALTH & SAFETY CODE ANN. § 341.014(a), (b), (e)(Vernon 2001).

The State was required to prove that on the specified dates, Appellant intentionally or knowingly discharged or permitted the discharge of a waste or pollutant, namely, sewage, into or adjacent to water in Texas, namely, underground water near 215 McArthur that caused or threatened to cause water pollution and that this discharge was done without a permit, order, or rule adopted by the appropriate regulatory agency. *See* TEX.WATER CODE ANN. § 7.145.

■■■ Comparing the charged offense with paragraphs (a), (b)(2), and (e) of Section 341.014, we find that the asserted lesser-included offenses are not established by proof of the same or less than all the facts required to establish the commission of the offense charged. *See* TEX.CODE CRIM.PROC.ANN. art. 37.09(1). Section 341.014(a) requires disposal of human excreta in a system constructed and maintained in conformity with the department's specifications, or by other methods approved by the health department. *See* TEX.HEALTH & SAFETY CODE ANN. § 341.014(a). The facts required to establish commission of unauthorized discharge causing or threatening to cause water pollution do not require such additional proof. Paragraphs (b)(2) and (e) of Section 341.014 would require the State to prove the creation of a public health nuisance. *See* TEX.HEALTH & SAFETY CODE ANN. § 341.014(b)(2), (e). Appellant points out that under Section 341.011 of the Health and Safety Code, the following is defined as a public health nuisance: "sewage, human excreta, wastewater, garbage, or other organic wastes deposited, stored, discharged, or exposed in such a way as to be a potential instrument or medium in disease transmission to a person or between persons." TEX.HEALTH & SAFETY CODE ANN. § 341.011(5) (Vernon 2001). Appellant also notes that Section 26.001of the Water Code defines pollution as: "the alteration of the physical, thermal, chemical, or biological quality of, or the contamination of, any water in the state that renders the water harmful, detrimental, or injurious to humans, animal life, vegetation, or property or to public health, safety, or welfare, or impairs the usefulness or the public enjoyment of the water for any lawful or reasonable purpose." *See* TEX.WATER CODE ANN. § 26.001(14)(Vernon Supp.2003)(effective upon delegation of NPDES permit authority). Appellant argues that a public health nuisance as defined above constitutes partial proof of unauthorized discharge, differing only in the additional proof that the discharge was "into or adjacent to water." We disagree. The charged offense does not require the State to prove that the actual or threatened water pollution created a *nuisance,* that is, that the discharge of the sewage was a "potential instrument or medium in disease transmission to a person or between persons." *See* TEX. HEALTH & SAFETY CODE ANN. § 341.011(5). While an alteration of water in the state may render that water "harmful, detrimental, or injurious" to humans and therefore polluted, the proof of this status does not require specific additional proof that the discharge of sewage or human excreta, which altered the water, was done in such a manner as to make the discharged mate-

reference to Section 341.014(a), (b)(2), and (e), respectively: "(3) a person commits an offense if he disposes of human excreta in a method not approved by the health department; (4) a person commits an offense if he disposes of effluent from a septic tank in a method that creates a public health nuisance; and (5) a person commits an offense if he removes human excreta from any place and handle[s] it in a manner that creates a public nuisance."

rial a potential instrument or medium for disease transmission—evidence which would establish a public health nuisance violation.

Alternatively, Appellant argues that disposing of sewage in a manner that causes a public health nuisance differs from unauthorized discharge only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission. *See* TEX.CODE CRIM.PROC.ANN. art. 37.09(2). Specifically, Appellant contends that potential transmission or disease is a less serious injury or risk of injury than transmission of disease through contamination of water. Article 37.09(2) applies to greater and lesser offenses that differ only by the injury or risk of injury. *See* TEX.CODE CRIM.PROC. ANN. art. 37.09(2). As discussed above, the State was not required to prove transmission of disease through contamination of water. Article 37.09(2) does not provide a basis for establishing any of the asserted lesser offenses as lesser-included offenses for the offense of unauthorized discharge of a waste or pollutant. Issues Two, Three, and Four are overruled.

### Section 341.013: Garbage, Refuse, and Other Waste

■ In Issues One and Five, Appellant argues that paragraphs (b) and (c) of Section 341.013 of the Texas Health and Safety Code are lesser-included offenses of unlawful discharge under Section 7.145 of the Texas Water Code. In pertinent part, Section 341.013 provides:

(b) Kitchen waste, laundry waste, or sewage may not be allowed to accumulate in, discharge into, or flow into a public place, gutter, street, or highway.

(c) Waste products, offal, polluting material, spent chemicals, liquors, brines, garbage, rubbish, refuse, used tires, or other waste of any kind may not be stored, deposited, or disposed of in a manner that may cause the pollution of the surrounding land, the contamination of groundwater or surface water, or the breeding of insects or rodents.

TEX.HEALTH & SAFETY CODE ANN. § 341.013(b), (c). Again, by information, the State was required to prove that Appellant intentionally or knowingly discharged or permitted the discharge of a waste or pollutant, namely, sewage, into or adjacent to water in Texas, namely, underground water near 215 McArthur that caused or threatened to cause water pollution and that this discharge was done without a permit, order, or rule adopted by the appropriate regulatory agency. *See* TEX.WATER CODE ANN. § 7.145.

Comparing the charged offense with paragraph (b) of Section 341.013, we find that the asserted lesser-included offense is not established by proof of the same or less than all the facts required to establish the commission of the offense charged. *See* TEX.CODE CRIM.PROC.ANN. art. 37.09(1). Section 341.013(a) would require the State to prove Appellant discharged sewage "into a public place, gutter, street, or highway." *See* TEX.HEALTH & SAFETY CODE ANN. § 341.01(b). The facts required to establish commission of unauthorized discharge causing or threatening to cause water pollution do not require such additional proof.

■ Under Section 341.013(c), waste of any kind may not be deposited or disposed of in a manner that may cause the contamination of groundwater. *See* TEX.HEALTH & SAFETY CODE ANN. § 341.013(c). Comparing paragraph (c) of Section 341.013 with the charged offense, it appears that the same or less proof would establish the facts required to establish commission of the alleged unauthorized discharge offense. In

its response, the State argues that Section 341.013(c) is not a lesser-included offense because it would require the State to meet a higher burden of proof as the provision specifically identifies the type of water—groundwater or surface water—that is the object of contamination. Section 7.145 of the Water Code, in contrast, only requires that the State show the discharge was "into or adjacent to water", which the Code broadly defines as:

> [G]roundwater, percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, marshes, inlets, canals, the Gulf of Mexico inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or nonnavigable, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state.

*See* TEX.WATER CODE ANN. § 26.001(5).

In Appellant's case, however, the State specifically alleged that "underground water near 215 McArthur" was the object of actual or threatened water pollution. At trial, the State presented evidence to show the elements of the charged offense—evidence which could have also proven a violation of Section 341.013(c).[5]

■ However, even if we were to conclude that Section 341.013(c) were a lesser-included offense of the charged offense, there is no evidence that would permit a rational jury to find that if Appellant were guilty of an offense, he was guilty only of the alleged lesser offense. *See Rousseau*, 855 S.W.2d at 672. Under the second prong for determining whether Appellant was entitled to a charge on a lesser-included offense, the evidence must be evaluated in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the defendant on the greater offense while convicting him of the lesser-included offense. *Id.* In this case, if the jury were to find that Appellant deposited or disposed of waste in a manner that may cause the contamination of groundwater, such a finding would necessarily be based upon evidence that the undisputed manner of disposal, pumping sewage onto the ground, was the conduct that may have caused contamination of groundwater. Further, in this case a finding of the threatened groundwater contamination could only be supported by the same evidence at trial showing the discharge was "into or adjacent to" the underground water near 215 McArthur. Therefore, the second prong cannot be satisfied. We overrule Issues One and Five.

### Factual Sufficiency of the Evidence

■ In Issues Six and Seven, Appellant complains the evidence is factually insuffi-

---

5. We note that Appellant's proposed jury charge altered the provision by rephrasing the admonishing language of "waste of any kind may not be stored, deposited, or disposed" to "a person commits an offense if he deposits or disposes of polluting material or waste." Section 341.091 of the Health and Safety Code provides:

(a) A person commits an offense if the person violates this chapter or a rule adopted under this chapter. An offense under this Section is a misdemeanor punishable by a fine of not less than $10 or more than $200.

. . .

(c) Each day of a continuing violation is a separate offense.

TEX HEALTH & SAFETY CODE ANN. § 341.091(a), (c)(Vernon 2001). In additional to the criminal penalty provision, violations of chapter 341 may be subject to civil enforcement proceedings and penalties under Section 341.092 of the Health and Safety Code. *See* TEX HEALTH & SAFETY CODE ANN. § 341.092.

cient because the State failed to prove that the sewage he discharged "caused or threatened to cause" water pollution or that the discharge was "into or adjacent to" underground water.[6] Specifically, Appellant asserts that his expert offered contrary evidence that the sewage did not pollute or threaten to pollute water.

## Standard of Review

Appellant does not challenge the legal sufficiency of the evidence to support his convictions for unlawful discharge, therefore we begin with the presumption that the evidence was legally sufficient. *See Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim.App.1996). In reviewing the factual sufficiency of the evidence, we examine all the evidence in a neutral light, favoring neither party. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App.2000); *Clewis*, 922 S.W.2d at 129. A reviewing court in conducting a factual sufficiency review asks whether a neutral review of all of the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Johnson*, 23 S.W.3d at 11. We review the evidence weighed by the trier of fact that tends to prove the existence of the elemental fact in dispute and compare it with the evidence that tends to disprove that fact. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim.App.1996), *cert. denied*, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). Although we are authorized to set aside the fact finder's determination under either of the two circumstances, our review must employ appropriate deference to prevent the substitution of our judgment for that of the fact finder. *See Johnson*, 23 S.W.3d at 12; *Jones*, 944 S.W.2d at 648. Further, we will not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility given to any evidence presented at trial. *See Johnson*, 23 S.W.3d at 7; *Jones*, 944 S.W.2d at 648.

In the present case, Terry McMillan, the State's expert witness, provided key testimony to support the State's allegation that Appellant discharged sewage into or adjacent to underground water near 215 McArthur that caused or threatened to cause water pollution. As manager for the Waste and Waters Section of the TNRCC, Mr. McMillan's work involved studying groundwater in El Paso County on a regular basis and knowing the depth of groundwater in the county. Mr. McMillan was familiar with reports concerning underground water in the proximate area of 215–217 McArthur in Canutillo, El Paso County. Based on his agency's research, it was Mr. McMillan's opinion that the depth of the groundwater near 215–217 McArthur ranged from eight to twenty feet, depending on certain factors such as the amount of water in the Rio Grande, irrigation activities, seasonal changes, and rainfall. Mr. McMillan testified that the depth of underground water is at its highest during the months of July and August, at which time the agency normally observes an eight to ten foot water table. A recent measurement of the water table at a location two-tenths of a mile south of 215–217 McArthur and about a one foot lower in elevation recorded the water table at eighteen feet. Mr. McMillan estimated that based on this data the water table under Appellant's property at that given time, January 2002, would be nineteen or twenty feet. Mr. McMillan conceded that

---

6. Appellant does not dispute the fact that he discharged sewage onto the ground on the three alleged occasions.

the water table could be as low as twenty-five feet, but stated that historical data placed the average range between eight to twenty feet.

Mr. McMillan also provided testimony concerning the characteristics and rate of permeability of the soil type found in the Canutillo area and visually observed on Appellant's property. Based on knowledge from personal observations, reports, published data, and permeability studies of the area, Mr. McMillan opined that sandy loam, the type of soil at 215–217 McArthur, had an average permeability of ten to twelve inches an hour, depending on the amount of gravel it contained. Mr. McMillan stated that if the soil was wet, new fluids would move faster through that soil than if it were dry, with the new fluids moving through the soil like a pipeline. While the ground between the surface and the groundwater will filter out contaminants like fecal coliform and e. coli to some extent, to do so efficiently requires a distance of several hundred feet. At eight to twenty feet, the range of the water table in the area, Mr. McMillan would expect contaminants to make it to the groundwater with minimal filtering. A sample from the water well on the property, however, tested negative for e. coli or coliform bacteria.

With respect to the proximity of the Rio Grande River, State witness Rick Talamantes, a criminal investigator with TNRCC, testified that the distance from Appellant's property to the eastern bank of the Rio Grande River was 1,428 feet. Mr. McMillan testified that there is a two foot drop in elevation between Appellant's property and the river bank. Mr. McMillan also stated that the groundwater in that area is in direct contact with the Rio Grande River and the irrigation ditch running alongside the river.

At trial, Appellant called Jerry Estep, a real estate broker and friend, to testify about the drilling of a hole on Appellant's property. Mr. Estep observed workers drilling a hole in search of the water table underneath the property. They measured the hole depth at twenty-two feet without seeing water or wet sand.

Appellant's expert witness, Frank Gadet, tested the permeability of the soil on Appellant's property by collecting a soil sample, placing six inches of the collected soil into a plastic cylinder, pouring two inches of water onto the soil, and observing the sample for half an hour. Mr. Gadet noted that the soil, a sandy loam type, absorbed the water. The water did not extend more than five to six inches down and the remaining tube was dry. Based on his experiment, Mr. Gadet opined that two inches of water would be percolated in six inches of ground. In Mr. Gadet's opinion, the waste water Appellant placed on the ground dried out and was absorbed in the soil, traveling no more than three feet into the ground. According to Mr. Gadet, the waste did not come anywhere near the groundwater, therefore, any coliform or other pollutant it contained remained in the soil without reaching the groundwater.

From the State's evidence, the jury could reasonably infer that the geological characteristics of the region were similar to those found on Appellant's property and its surroundings. The State's evidence also supported an inference that the historical data on groundwater in the region, that is, during the months of July and August the water table measures at eight to ten feet and at other times of the year measures up to twenty feet, was also applicable to groundwater that likely exists under Appellant's property as well. Mr. Talamantes' GPS measurements placed the proximity of the Rio Grande River within 1,500 feet of the 215–217 McArthur property and in Mr. McMillan's expert opinion

groundwater near 215 McArthur was in direct contact with the surface water of the river. Appellant offered contrary evidence that the water table was more than twenty-two feet below the property and his expert, Mr. Gadet, stated that the waste water was absorbed within three feet of the soil without ever reaching groundwater. The jury is the sole judge of witness credibility and is free to believe or disbelieve any witness. *Jones v. State*, 984 S.W.2d 254, 258 (Tex.Crim.App.1998). By its verdict, the jury apparently found Mr. McMillan more credible with regard to soil type permeability, groundwater measurements in the Canutillo region, and the ability of soil to filter out contaminants.

Viewing all the evidence in a neutral light, we cannot conclude that the State's proof was too weak, by itself, to support the jury's findings that the discharge was adjacent to water and threatened to cause water pollution nor is the jury's finding of guilt so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Finding the evidence was factually sufficient to support the conviction, we overrule Issues Six and Seven.

### Illegal Sentence/Probation Condition

In Issue Eight, Appellant contends the trial court erred in assessing an illegal, vague and/or unreasonable sentence and in relinquishing the trial court's responsibility by allowing others to set the conditions of probation. First, Appellant complains that the following handwritten language, which appeared on the judgment and sentence, was part of the sentence because it does not appear on Exhibit A, the form listing probation conditions:

[W]ithin 30 days of today's date, [defendant] to employ engineer to design & submit a plan for septic system that will protect water on both 215 & 217 McAr-

thur, said plan to be approved by OSSF Program [On–Site Sewage Facility] w/in 30 days of approval by OSSF, construction is to be completed.

However, at the conclusion of the punishment phase of the trial, the trial judge expressly stated that the above requirement was a condition of Appellant's probation. Community supervision, or probation, is an arrangement *in lieu of* the sentence, *not as part of* the sentence. *Speth v. State*, 6 S.W.3d 530, 532 (Tex. Crim.App.1999)(en banc). The sentence and the conditions of community supervision are separate parts of the judgment. *Id.* We conclude the above requirement was a condition of Appellant's probation, not an illegal sentence.

Second, in the alternative Appellant argues that the probation condition was vague and unreasonable and constituted the trial court's relinquishment by allowing others to set the conditions of probation. The trial court has broad discretion in determining the conditions of probation to be imposed. *Speth*, 6 S.W.3d at 533. The judge may impose any reasonable condition that is designed to protect or restore the community, protect or restore the victim, or punish, rehabilitate, or reform the defendant. *Id.*; TEX.CODE CRIM.PROC. ANN. art. 42.12, § 11(a)(Vernon Supp.2003). Conditions not objected to are affirmatively accepted as terms of the award of community supervision, which the courts of Texas consider a contractual privilege. *Speth*, 6 S.W.3d at 534. "A defendant who benefits from the contractual privilege of probation, the granting of which does not involve a systemic right or prohibition, must complain at trial to conditions he finds objectionable." *Id.*

In this case, Appellant on direct examination at the punishment phase of the trial confirmed that he was willing to do what was being requested, that is, have an engi-

neer go to his property and develop a plan for putting in a septic system which will help protect the water on the property. Rather than raising a formal objection to the challenged probation condition, Appellant's counsel asked the trial judge that the time allotted for approval and construction be increased from thirty to sixty days. Appellant made no formal objection to the imposition of this condition on his probation. Therefore, he cannot raise his complaint for the first time on appeal. *See Speth*, 6 S.W.3d at 534 n. 10 (complaints that a trial court abused its discretion by imposing conditions that are unreasonable or violate constitutional rights or statutory provisions must be timely objected to in order to be raised on appeal). Issue Eight is overruled.

We affirm the trial court's judgment.